IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO ROSE, | No. C06-00951 MJJ |
| Plaintiff, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| ANTHONY KANE, | |
| Defendant. | |

## INTRODUCTION

Before the Court is Petitioner Marco Rose's ("Petitioner") petition for a writ of habeas corpus[1] ("Petition"), filed pursuant to 28 U.S.C. § 2254. Petitioner alleges that the California Board of Parole Hearings[2] ("Board") violated his federal due process rights when, at a March 23, 2005 parole hearing, the Board found him unsuitable for parole for the tenth time. For the following reasons, the Court **DENIES** the petition for writ of habeas corpus.

///

///

///

///

---

[1] Docket No. 1 (February 13, 2006).

[2] The Board of Parole Hearings was formerly named the Board of Prison Terms. *See* Cal. Pen. Code § 5075.

**BACKGROUND**

A. <u>The Commitment Offense</u>[3]

On October 9, 1984, three members of the Barrio Nuevo Estrada street gang stood in front of an apartment building in Los Angeles. At approximately 8:30 p.m., a 1973 Ford pickup truck with a camper shell approached the group. Petitioner was driving the truck, accompanied by two other males. All occupants of the vehicle were members of the White Fence street gang, a rival gang of the Barrio Nuevo Estrada street gang. As the pickup truck entered the intersection near where the Barrio Nuevo Estrada members stood, Petitioner stated to a passenger, "There they are." Then a passenger in the truck pointed a 22-caliber rifle out of the camper shell window and fired approximately six shots at the rival gang members, striking one of them multiple times and killing him. Petitioner then sped away with the two passengers in the truck. Petitioner was arrested nine days later.

B. <u>March 23, 2005 Parole Proceedings</u>

On March 23, 2005, Petitioner received his tenth parole hearing. Both Petitioner and his attorney were present and given an opportunity to speak. The Board first discussed the commitment offense with Petitioner, relying on the Probation Officer's report. Petitioner had no objection to the Board's use of this version of the commitment offense, but his attorney informed the Board that Petitioner would not be "discussing the crime [at the hearing]." (Pet., Ex. A at 7:16-18.) Petitioner also agreed that the Board could use Petitioner's version of the offense that he gave in another parole proceeding in October, 2003.

Second, the Board discussed Petitioner's pre-commitment history, beginning with prior contact with law enforcement. The Board began by questioning Petitioner regarding a murder charge against Petitioner when he was 11 years old that was later dropped. (Pet., Ex. A at 11:1-12.) Petitioner explained that the incident had to do with somebody throwing a rock on a freeway. (Pet., Ex. A at 11:24-12:3.) Since Petitioner and his family lived so close to the freeway, the authorities

---

[3]This description of the commitment offense is from the Board hearing transcript included as an exhibit in the petition, which quoted from the Probation Officer's Report. *See* Petition for Writ of Habeas Corpus ("Pet."), Ex. A at 8:11-9:25.

2

1   believed them to be suspects.  (*Id.*)  The Board went on to note that Petitioner's only other contact
2   with law enforcement, other than the juvenile charge and the commitment offense, was an arrest for
3   possession of a dangerous weapon in 1984.  (Pet., Ex. A at 12:4-14.)

4         The Board then moved to Petitioner's social history, including the fact that he was the second
5   of five siblings, he was raised by both parents, and that Petitioner was still in contact with all of his
6   family.  (Pet., Ex. A at 12:25-13:18.)  Petitioner is high school graduate and began associating with
7   the White Fence gang in high school.  (Pet., Ex. A at 13:14-6.)  Petitioner joined the Marine
8   reserves after high school and was still a reserve at the time he committed the crime.  (Pet., Ex. A at
9   14:9-24.)  Petitioner was 22 years old at the time he committed the commitment offense, had never
10  married and had no children.  (Id.)  Petitioner worked full-time during summers at a factory where
11  his father worked.  (Pet., Ex. A at 14:25-15:4.)  Petitioner stated that he drank occasionally and
12  "smoked [marijuana] when [he] was in high school."  (Pet., Ex. A at 15:5-12.)

13        The Board next focused on Petitioner's history with the gang.  Petitioner stated that he got
14  involved with gang members when he was 14 or 15 years old and that none of his siblings were
15  involved in gangs.  (Pet., Ex. A at 15:22-16:3.)  In response to how Petitioner could complete high
16  school, enlist in the Marines and still be involved with gangs, Petitioner stated that "[he] was trying
17  to fade out of it, but [he] messed up."  (Pet., Ex. A at 15:13-21.)

18        Third, the Board went over Petitioner's parole plans.  The Board recognized that Petitioner
19  had 10 letters of support from family members offering their homes to Petitioner and one standing
20  offer for consideration of employment from Edmund A. Gray Company.  (Pet., Ex. A at 16:11-19:1.)

21        Fourth, the Board addressed Petitioner's post-commitment programming.  The Board relied
22  on Petitioner's counselor's report ending in August 2004 and then asked Petitioner to amend any
23  information that needed to be corrected or updated.  (Pet., Ex. A at 19:18-19.) According to the
24  report, Petitioner received a certificate of proficiency from the California Prison Industry Authority
25  in furniture upholstery and sewing.  (Pet., Ex. A at 19:27-20:27.)  Petitioner accumulated 1,500-plus
26  sewing hours.  (*Id.*)  Petitioner earned quarter reports reflecting satisfactory to above average work
27  grades.  (*Id.*)

28        Petitioner has an impressive educational record.  Petitioner completed over 3,421 hours in a

*(Left margin: United States District Court, For the Northern District of California)*

1  vocational arts and offset printing program, did "some programming" through Hartnell College,
2  completed a certificate of recognition for completion of 100 video reports from the Valley Adult
3  School, and made the honor roll. (Pet., Ex. A at 22:1-24:15.)  Petitioner mentioned that he stopped
4  taking college programming due to budget cuts at the facility. (*Id.*)  The Board had trouble locating
5  Petitioner's actual transcript and emphasized that Petitioner "ought to make that part of [his] file."
6  (*Id.*)

7        The Board moved on to self-help group programs.  Petitioner completed a two-hour video
8  inmate employability program, 125 hours of video reports, 120-hour life plan for recovery, Breaking
9  Barriers, Kairos, Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA"), Conflict
10 Resolution, "basic," and "morals and values." (Pet., Ex. A at 24:16-26.)  Petitioner explained that,
11 although he only claims to drink occasionally, he participated in AA and NA at the Board's request
12 and at the advice of "one of the boys." (Pet., Ex. A at 25:1-27.)

13       The Board then focused on Petitioner's retention of the 12-step program, specifically the
14 eighth and ninth steps that deal with making amends to all people that one's harmed. (Pet., Ex. A at
15 26:11-15.)  Petitioner responded that he "[tried] to get along with people better and that's it." (Pet.,
16 Ex. A at 26:20-21.)  The Board segued into an attempted examination of Petitioner's remorse for his
17 commitment offense, and Petitioner delivered vague responses about "bettering himself" and
18 thinking about "the victim's family and [Petitioner's] family." (Pet., Ex. A at 26:22-28:6.)  The
19 Board openly tried to "help [Petitioner] along" by leading him into situations where he had the
20 opportunity to comment on the extent of his remorse for the committed offense. (Pet., Ex. A at
21 28:23-29:11.)  Petitioner failed to elaborate on the Board's cues and the discussion shifted to
22 Petitioner discussing his recreational activities like running, reading, working out and occasionally
23 attending church. (Pet., Ex. A at 29:13-30:17.)  Petitioner explained that he did not attend church
24 regularly because it opened "too many gates." (Pet., Ex. A at 30:20-24.)

25       Next, the Board reviewed Petitioner's clean behavioral history.  In particular, the Board was
26 impressed that the Petitioner did "not get any [CDC] 115s [his] whole period of sentence time[.]"
27 (Pet., Ex. A at 31:13-16.)  Petitioner explained that he just "dodge[s] different people" because if "a
28 dude's messing up" then Petitioner "just avoids him." (Pet., Ex. A at 31:17-32:5.)  Before moving

4

on to review Petitioner's psychological evaluations, the Board gave Petitioner "an opportunity to present [himself] to the Panel… in the best possible light[.]" (Pet., Ex. A at 32:9-10.) Petitioner responded that he was "bettering himself," that it was "time to grow up" and that he has learned that members of rival gangs are "just the same guys like [Petitioner]." (Pet., Ex. A at 32:17-33:2.)

Finally, the Board reviewed Petitioner's psychological evaluations. The first report was from William Gamard, staff psychologist, from April 2002. (Pet., Ex. A at 33:3-11.) In general, Gamard wrote that "[s]hould this inmate at this time be given a parole or release date, his prognosis for maintaining his present gains in the community is excellent." (Pet., Ex. A at 34:3-6.) However, the Board emphasized Gamard's comments regarding Petitioner's insight into the offense: "Although [Petitioner] could have shown more insight into the offense, he had a little more to say about it than in previous psychological reports." (Pet., Ex. A at 37:9-12.) Ultimately, Gamard concluded that "[t]his inmate does not have a mental health disorder, which would necessitate treatment either during his incarceration period or following parole." (Pet., Ex. A at 37:24-27.)

The second psychological report came from January 1999 by Steven Terrini. (Pet., Ex. A at 38:2-3.) The Board focused on Terrini's statements that "[Petitioner] appeared to express some guilt, although his remorse appeared to be rather superficial. Previous psychological evaluations have suggested that his insight into his commitment offense was rather limited. This evaluator agrees with that assessment." (Pet., Ex. A at 38:16-23.) Furthermore, Terrini concluded that Petitioner is "not psychologically sophisticated enough to fully understand the implication of the crime." (Pet., Ex. A at 38:26-39:2.)

At the end of the hearing, Deputy District Attorney Dahle spoke on behalf of the Los Angeles County District Attorney's office, stating that the District Attorney was opposed to a suitability finding because Petitioner failed to "adequately address the issues regarding [his] antisocial behavior [surrounding the commitment offense] given all of the other favorable circumstances [in Petitioner's record]." (Pet., Ex. A at 42:24-27.) Petitioner's attorney spoke next, calling the Board's attention to the fact that Petitioner has no history of violence, no behavior problems in prison, he is a high school graduate, a Marine reserve, had great work history and good family support. (Pet., Ex. A at 43:14-45:20.) Petitioner's attorney went on to plead to the Board

5

1  that Petitioner's sole issue is his inability to explain his attraction to gangs and this inability is due to
2  Petitioner's limitations in expressing himself, not due to a lack of insight. (*Id.*)

3  Ultimately the Board denied Petitioner's parole for one year. The Board concluded that
4  Petitioner was "not yet suitable for parole and would pose an unreasonable risk of danger to society
5  or a threat to public safety if released from prison." (Pet., Ex. A at 46:5-49:26.) One reason the
6  Board gave was the commitment offense. (*Id.*) The offense was a "callous crime" with "multiple
7  potential victims." (*Id.*) Several people were shot at, it was a dispassionate crime, and it
8  demonstrated an "exceptionally callous disregard for human suffering." (*Id*.) Further, the motive
9  was trivial. (*Id.*) According to the Board, Petitioner has an unstable social history that "relates
10 directly to his gang affiliation, and behavior related to that." (*Id.*) Petitioner lacked insight and
11 needs to continue self-help in order to "help him to develop insight into [his] crime" and to the
12 behavior leading up to the crime. (*Id.*) Although Petitioner exhibited many positive attributes to his
13 rehabilitation, "the positive aspects of behavior do not outweigh the factors of unsuitability" and
14 Petitioner should "expect that the area of insight [will] be looked at closely" in future hearings.

**PROCEDURAL BACKGROUND**

16 Los Angeles County Superior Court denied Petitioner's original writ for habeas corpus on
17 July 19, 2005, and the California Court of Appeals denied the petition for review on September 13,
18 2005. The California Supreme Court denied review on November 16, 2005. Respondent Anthony
19 Kane ("Respondent") concedes that Petitioner has exhausted the administrative and state court
20 remedies regarding the federal due process claim. For the purposes of 28 U.S.C. § 2254(d), the last
21 "reasoned [state court] decision" is the July 19, 2005 Los Angeles Superior Court Order, in which
22 the court denied the petition on the grounds that Petitioner's "inability or unwillingness to explain
23 his contradictory lifestyle" is "some evidence" he lacks insight into his role in the commitment
24 offense. (Pet., Ex. D at 3:17-18.) *See LaJoie v. Thompson*, 217 F. 3d 663, 669 n.7 (9th Cir. 2000)
25 (stating that in determining whether the state court's decision is contrary to, or involved in an
26 unreasonable application of, clearly established federal law, a federal court should look to the
27 decision of the highest state court to address the merits of a petitioner's claim in a reasoned
28 decision).

6

1    Petitioner filed this habeas corpus petition pursuant to 28 U.S.C. § 2254 on the grounds that
2 the Board violated his federal due process rights when, at a March 23, 2005 parole hearing, the
3 Board found him unsuitable for parole for the tenth time. This Court ordered Respondent to show
4 cause why the petition should not be granted on the basis of Petitioner's claim.[4] Petitioner moved
5 for judgment on the pleadings when Respondent failed to show cause.[5] This Court denied
6 Petitioner's motion and extended Respondent's time to answer.[6] Respondent filed an answer,
7 accompanied with memorandum and exhibits.[7] Petitioner filed a traverse.[8]

## LEGAL STANDARDS

### I. Due Process

While there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979), a state's statutory parole scheme, if it uses mandatory language, may create a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutionally protected liberty interest. *See Board of Pardons v. Allen*, 482 U.S. 369, 376-78 (1987) (holding that Montana parole statute providing that board "shall" release prisoner, subject to certain restrictions, creates due process liberty interest in release on parole); *Greenholtz*, 442 U.S. at 11-12 (holding that Nebraska parole statute providing that board "shall" release prisoner, subject to certain restrictions, creates due process liberty interest in release on parole). In such a case, a prisoner gains a legitimate expectation in parole that cannot be denied without adequate procedural due process protections. *See Allen*, 482 U.S. at 373-81; *Greenholtz*, 442 U.S. at 11-16.

California's parole scheme uses mandatory language and is largely parallel to the schemes found in *Allen* and *Greenholtz* to give rise to a protected liberty interest in release on parole:

---

[4] Docket No. 3 (March 27, 2006).

[5] Docket No. 4 (June 7, 2006).

[6] Docket No. 8 (June 15, 2006).

[7] Docket No. 9 (August 11, 2006).

[8] Docket No. 10 (August 28, 2006).

7

> The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Cal. Penal Code § 3041(b). Accordingly, under the clearly established framework of *Allen* and *Greenholtz*, "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002).[9] The scheme creates a presumption that parole release will be granted unless the statutorily defined determinations are made. *Id.*[10] This is true regardless of whether a parole release date has ever been set for the inmate, because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003) (finding initial refusal to set parole date for prisoner with 15-to-life sentence implicated prisoner's liberty interest); *cf. McQuillion*, 306 F.3d at 903 (finding decision to rescind previously-granted parole release date implicated prisoner's liberty interest).

Where the petitioner already has served the parole term initially set for him, however, any challenge to calculation of the term is moot unless he can show that he is suffering collateral consequences from the earlier decision. *See Caswell v. Calderon*, 363 F.3d 832, 836-37 (9th Cir. 2004) (petitioner could not bring ex post facto challenge to term of confinement set by parole board in 1986 where he had already served that term of confinement and a subsequent 1999 parole board decision that rescinded the earlier release date did not constitute an "actual collateral consequence" of the earlier calculation).

Because California prisoners have a constitutionally protected liberty interest in release on parole, they cannot be denied a parole date (i.e., the parole board cannot decline to grant a parole

---

[9] In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court roundly criticized the mandatory language methodology described above and offered a new test; however, the *Sandin* test relates to claims dealing with the day-to-day management of prisons and does not apply to parole eligibility determinations. *See McQuillion*, 306 F.3d at 902-03; *Ellis v. District of Columbia*, 84 F.3d 1413, 1417-18 (D.C. Cir. 1996).

[10] *See also Armstrong v. Davis*, 275 F.3d 849, 864-65 (9th Cir. 2001) (finding state statute "sufficiently determinate" to require parole hearings "as a matter of constitutional right"); *Powell v. Gomez*, 33 F.3d 39, 40 (9th Cir. 1994) (assuming state created liberty interest in parole); *Perveler v. Estelle*, 974 F.2d 1132, 1134 (9th Cir. 1992) (same). *But cf. Weaver v. Maass*, 53 F.3d 956, 960-61 (9th Cir. 1995) (where parole board not statutorily required to reconsider release date, statement at hearing that it would reconsider release date did not create liberty interest).

8

1  date and cannot rescind an already-granted parole date) without adequate procedural protections
2  necessary to satisfy due process.

3  **II.    "Some Evidence" Standard**

4      A parole board's decision must be supported by "some evidence" to satisfy the requirements
5  of due process. *McQuillion*, 306 F.3d at 904 (adopting "some evidence" standard for disciplinary
6  hearings outlined in *Superintendent v. Hill*, 472 U.S. 445 (1985)); *Morales v. California Dep't of*
7  *Corrections*, 16 F.3d 1001, 1005 (9th Cir. 1994) (same), *rev'd on other grounds*, 514 U.S. 499
8  (1995); *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987) (same).[11]
9  Additionally, the evidence underlying the board's decision must have some indicia of reliability.
10 *McQuillion*, 306 F.3d at 904; *Jancsek*, 833 F.2d at 1390. Accordingly, if the board's determination
11 of parole suitability is to satisfy due process, there must be some evidence, with some indicia of
12 reliability, to support the decision. *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005);
13 *McQuillion*, 306 F.3d at 904.

14     A relevant factor in determining whether the evidence underlying the board's decision has
15 some indicia of reliability is whether the prisoner was afforded an opportunity to appear before, and
16 present evidence to, the board. *See Pedro v. Oregon Parole Bd.*, 825 F.2d 1396, 1399 (9th Cir.
17 1987), *cert. denied*, 484 U.S. 1017 (1988). When applying these standards, the court may look to
18 whether a prisoner's allegations of any violations by the board are of a "minor" nature, whether they
19 are supported in fact, whether the prisoner had an opportunity to participate, and whether he took
20 full advantage of that opportunity. *See Morales*, 16 F.3d at 1005; *see also McQuillion*, 306 F.3d at
21 900 (acknowledging general right to call witnesses at parole rescission hearing).[12]

22     The court may also consider the parole board's decision-making process over time: "The
23 Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the

---

[11]*See, e.g., Biggs v. Terhune*, 334 F.3d 910, 915-17 (9th Cir. 2003) (finding several grounds for denial of parole release date lacked evidentiary support, but denying habeas relief because three other grounds were supported by some evidence); *McQuillion*, 306 F.3d at 903-912 (granting habeas relief on ground that parole rescission violated due process because none of the four "good cause" grounds for rescission of parole date was supported by "some evidence" of a failure by the granting panel to adequately consider the evidence before it).

[12]State statutes that define standards for parole eligibility are not overly broad in violation of due process if they meet general parole criterion that the release not be detrimental to the community. *See Glauner v. Miller*, 184 F.3d 1053, 1054-55 (9th Cir. 1999) (citing *Allen*, 482 U.S. at 380).

9

1  factors considered. . . . A continued reliance in the future on an unchanging factor . . . runs contrary
2  to the rehabilitative goals espoused by the prison system and could result in a due process violation."
3  *Biggs v. Terhune*, 334 F.3d 910, 916-17 (9th Cir. 2003). In *Biggs*, the Ninth Circuit upheld the
4  initial denial of a parole release date based solely on the nature of the crime and the prisoner's
5  conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to
6  demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply
7  because of the nature of Biggs' offense and prior conduct would raise serious questions involving
8  his liberty interest in parole." *Id.*; *cf. Rosas*, 428 F.3d at 1232 (nature and circumstances of
9  prisoner's crime, along with his psychiatric reports, constituted evidence with sufficient reliability to
10 support board's denial of parole and deferment of next parole suitability hearing for 5 years).

11 A prisoner is entitled to have his release date considered by a parole board that is free from
12 bias or prejudice. *O'Bremski v. Maas*, 915 F.2d 418, 422 (9th Cir. 1990) (citing *Schweiker v.*
13 *McClure*, 456 U.S. 188, 195 (1982); *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972); and *Sellars v.*
14 *Procunier*, 641 F.2d 1295, 1303 (9th Cir. 1981)).

### III.   The Antiterrorism and Effective Death Penalty Act

16 This court may entertain a petition for habeas corpus "on behalf of a person in custody
17 pursuant to the judgment of a State court only on the ground that he is in custody in violation of the
18 Constitution or the laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423
19 U.S. 19, 21 (1975).[13] The Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to
20 habeas review of a state court decision upholding a parole board's denial of parole. *Sass*, 2006 WL
21 2506393, at *2; *Cass v. Woodford*, 432 F. Supp. 2d 1061, 1064 (S.D. Cal. 2006) (stating that where a
22 state court hears a claim of due process violation by the parole board on collateral review, the claim
23 has been "adjudicated on the merits" in a state court proceeding for purposes of the AEDPA); *see* 28
24 U.S.C. § 2254(d).

25 Under the AEDPA, this Court may grant a petition challenging a state conviction or

---

[13] "Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction.'" *Sass v. Cal. Bd. of Prison Terms*, 2006 WL 2506393 at *2 (9th Cir. Aug. 31, 2006) (quoting *White v. Lambert*, 370 F.3d 1044, 1055 (9th Cir. 2004)).

10

1 sentence on the basis of a claim that was adjudicated on the merits in state court only if the state
2 court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an
3 unreasonable application of, clearly established federal law, as determined by the Supreme Court of
4 the United States; or (2) was based on an unreasonable determination of the facts in light of the
5 evidence presented in the state court proceeding. *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003);
6 28 U.S.C. § 2254(d)(2).

A state court decision is "contrary" to clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that is materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

A state court decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," where the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the Petitioner's case. *Williams*, 529 U.S. at 413. However, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.[14]

## LEGAL CLAIMS

A.   The "Some Evidence" Standard Applies

Petitioner urges this Court to find that the "some evidence" standard is inapplicable to a federal court's review of a parole board's decision. However, the California Supreme Court held that a parole board's decision must be supported by "some evidence" to satisfy the requirements of due process. *In re Rosenkrantz*, 29 Cal. 4th 616, 653 (2002) (stating that "the factual basis for a

---

[14]The standard of review under AEDPA is different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim. In such a case, the District Court must conduct an independent review of the record to determine whether the state court's decision was objectively reasonable. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004); *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

11

1 decision granting or denying parole is subject to a limited judicial review under the "some evidence"
2 standard of review"); *see also McQuillon v. Duncan*, 306 F.3d 895, 904 (9th Cir. 2002) (noting that
3 the "some evidence" requirement is set forth in *Superintendent v. Hill*, 472 U.S. 445 (1985)). In
4 *Sass v. Cal. Bd. of Prison Terms*, a recent Ninth Circuit Court of Appeals decision, the court
5 affirmed the use of the "some evidence" standard in the parole context. *Sass*, 2006 WL 2506393, at
6 *4. The court held the standard is "clearly established" in the parole context, because "[t]o hold that
7 less than the some evidence standard is required would violate clearly established federal law
8 because it would mean that a state could interfere with a liberty interest - that in parole - without
9 support or in an otherwise arbitrary manner." 2006 WL 2506393, at *4. This Court finds that the
10 "some evidence" standard is applicable to a federal court's review of a parole board's decision.

   B.   <u>The Board's Decision Was Based on "Some Evidence"</u>

Petitioner argues in the alternative that, while the reviewing court must rely on the "some evidence" standard, the Board has a broader evidentiary standard, which requires that each of their findings of unsuitability is supported by a preponderance of all relevant, reliable evidence in the record. Petitioner further contends that the Board's decision was in violation of due process because all of the reliable evidence addressing Petitioner's suitability indicated that he did not pose an unreasonable risk of danger to public safety.[15] Respondent contends that the Board complied with due process.

The "some evidence" requirement is extremely deferential, and exists to assure that "the record is not so devoid of evidence that the findings of the disciplinary board were without support or were otherwise arbitrary." *Hill*, 472 U.S. at 457; *Sass*, 2006 WL 2506393 at *4. To determine whether the "some evidence" standard is met "does not require examination of the entire record, independent assessment of the credibility of the witnesses, or weighing of the evidence." *Hill*, 472 U.S. at 455-456. The relevant question is "whether there is any evidence in the record that could

---

[15] Petitioner relies on *In re Scott* in supporting this proposition. However, *In re Scott* is distinguishable because there the court held that denial of release solely on the basis of the gravity of the commitment offense requires the Board to warrant the use of especially close scrutiny. *In re Scott*, 133 Cal. App. 4th 573, 594-596 (2005). Closer scrutiny is not required here since the Board did not solely rely on the commitment offense.

12

support the conclusion reached by the disciplinary board." *Id.* Additionally, the evidence "must have some indicia of reliability." *Biggs v. Terhune,* 334 F.3d 910, 915 (9th Cir. 2003) (quoting *Jancsek v. Oregon Bd. Of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987); *but see In re Scott*, 119 Cal. App. 4th 871, 898 (2004) (stating that the exceedingly deferential nature of the "some evidence" standard of judicial review "does not convert a court reviewing the denial of parole into a 'potted plant'").

When courts assess whether a state parole board's suitability determination is supported by "some evidence" in a habeas case, the analysis is framed by state law. California Code of Regulations, title 15, section 2402(a) states that:

> [t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society of released from prison.

The regulations direct the Board to consider "all relevant, reliable information available," as well as "any other information which bears on the prisoner's suitability for release." Cal. Code Regs., tit. 15, § 2402(b); *Martin v. Marshall*, 431 F. Supp. 2d 1038, 1045 (N. D. Cal. 2006). Further, the regulations list circumstances tending to indicate whether or not an inmate is suitable for parole. Cal. Code of Regs., tit. 15 § 2402(c)-(d).[16] However, these circumstances are meant to serve as "general guidelines," giving the Board latitude to weigh the importance of the combination of factors present in each case. Cal. Code of Regs., tit. 15, § 2404(c). Thus, the Board enjoys broad discretion in parole-related decisions. *In Re Powell*, 45 Cal. 3d 894, 902 (1988).

Here, the Board found that Petitioner was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison" because

---

[16] The circumstances tending to show an inmate's unsuitability are: (1) the commitment offense was committed in an "especially heinous, atrocious or cruel manner;" (2) previous record of violence; (3) unstable social history; (4) sadistic sexual offenses; (5) psychological factors such as "lengthy history of severe mental problems related to the offense;" and (6) prison misconduct. Cal. Code of Regs, tit. 15, § 2402(c). The circumstances tending to show an inmates suitability are: (1) no juvenile record; (2) stable social history; (3) signs of remorse; (4) commitment offense was committed as a result of stress which built up over time; (5) Battered Woman's Syndrome; (6) lack of criminal history; (7) age is such that it reduces the possibility of recidivism; (8) plans for future including development of marketable skills; and (9) institutional activities that indicate ability to function within the law. Cal. Code of Regs, tit. 15, § 2402(d).

13

1 the offense was a "callous crime," with "multiple potential victims," carried out for a "ridiculous
2 reason," that "demonstrates an exceptionally callous disregard for human suffering;" and Petitioner's
3 "insight, or lack thereof" is an issue "that [the Board] need[s] to have cleared up" before the Board
4 can feel confident granting Petitioner parole suitability.[17]  The Board addressed all relevant factors in
5 an extremely thorough manner.  The Court will examine each factor in turn.

### 1. The Commitment Offense

The Board's first ground for denial is Petitioner's commitment offense.  Petitioner argues that his commitment offense is murder and is inherently cruel; and the Board's determination that multiple people were shot at is nothing but a presumption unsupported by the record.  Respondent asserts that there is "some evidence" in the record to support the Board's findings.

The Board can consider the gravity of the commitment offense in assessing an inmate's suitability for parole. Cal. Penal Code § 3041(b); *see* Cal. Code of Regs., tit. 15, § 2492(c)(1).[18]

Here, the Board found that Petitioner carried out the commitment offense in a "cruel manner…which demonstrates an exceptionally callous disregard for human suffering." *See* Cal. Code. of Regs., tit. 15, § 2402(c)(1)(B), (D).  The Board noted that the victim of Petitioner's crime was shot several times, there were multiple potential victims, and the motive was "ridiculous" to the point of becoming a dispassionate crime.  Moreoever, Petitioner stated that "[Petitioner's passenger] shot at *them*" when referring to Petitioner's own version of the crime. (Pet., Ex. A at 10:12) (emphasis added).  This is "some evidence" supporting the Board's determination that there were multiple potential victims.  Also, Petitioner stated that the reason for shooting at the Barrio Neuvo

---

[17]The Board also based its decision to deny parole suitability on Petitioner's "unstable social history that relates directly to his gang affiliation, and behavior related to that."  The Los Angeles Superior Court, in its denial of Petitioner's writ of habeas corpus, struck the Board's finding of "unstable social history" as baseless, since no evidence in the record reflected such a determination, but upheld the Board's determination of Petitioner's unsuitability based on the Board's other reasons.  The Court agrees with the Superior Court and, thus, will not consider Petitioner's unstable social history as a factor in evaluating his request for habeas relief.

[18]The factors that tend to show the commitment offense was committed in an especially heinous, atrocious or cruel manner are: (1) multiple victims were attacked, injured or killed in th same or separate incidents; (2) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (3) the victim was abused, defiled or mutilated during or after the offense; and (4) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. Cal. Code of Regs., tit. 15, § 2402(c)(1)(A)-(D).

1 members was because they were "messing with" Petitioner "one day." (Pet., Ex. A at 10:15-17.)
2 This is "some evidence" of a trivial motive for a callous and dispassionate crime.

3 Despite Petitioner's arguments, this Court finds that the Board's determination that the crime
4 was "cruel," "callous" and "dispassionate" is supported by "some evidence."

### 2. Lack of Insight

The Board's second ground for denying Petitioner suitability for parole is his lack of insight into the commitment offense. Petitioner contends that the Board did not find Petitioner unsuitable based on lack of insight, and the forensic evaluation did not find inadequate insight. Respondent argues that the record sufficiently contains "some evidence" to support the Board's findings.

In assessing a petitioner's suitability for parole, the Board can rely on psychological factors such as the prisoner's "past and present mental state," Cal. Code of Regs., tit. 15, § 2402(b); whether the prisoner has a "lengthy history of severe mental problems related to the offense," Cal. Code of Regs., tit. 15, § 2402(c)(5); and whether the prisoner indicates that he "understands the nature and magnitude of the offense." Cal. Code of Regs., tit. 15, § 2402(d)(3).

Here, the Board "finds that the inmate needs to continue self-help in order to help him to develop insight into this crime and to the behavior that led to this crime." The Board acknowledged the fact that Petitioner had no serious infractions (CDC 115s) while in prison, and commended him for participating in Alcoholics Anonymous, Narcotics Anonymous, vocational programming, and completing college work. Still, the Board found that Petitioner's participation in these programs "did not outweigh the factors of unsuitability" because insight is "an issue that continues to be raised by every Panel and every psych report." Additionally, the Board forewarned Petitioner that he can "expect that the area of insight is going to be looked at closely" at future hearings. Finally, if Petitioner has trouble expressing himself orally, the Board suggested he take time to "write something" to explain Petitioner's insight into the crime.

Petitioner's contention that "the panel did not find petitioner unsuitable based on lack of insight, and the forensic evaluation did not find inadequate insight" is simply an inaccurate reading of the record. The Board expressly cited Petitioner's lack of insight as an obstacle in granting parole

15

suitability. *See* Pet., Ex. A at pp. 48-49.

Despite Petitioner's arguments, this Court finds that there is "some evidence" on the record to indicate that Petitioner would benefit from additional self-help and therapy programs.

C.     Denial of Parole Based on Unchanging Factors Does Not Abrogate Due Process.

Petitioner contends that "the sole grounds set forth by the [Board] for finding Petitioner unsuitable for parole was its boilerplate recitation of his offense factors and prior criminal history." Thus, he claims that the Board continues to deny him parole based solely on the "unchanging factor" of his commitment offense which essentially equates to interminably denying him parole. Petitioner relies on dicta in *Biggs*. Respondent argues that Petitioner received all process due under clearly established federal law.

In *Biggs,* the Court of Appeals upheld the denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [the petitioner]'s offense and prior conduct would raise serious questions involving his liberty interest in parole." *Biggs*, 334 F.3d at 916-17. The court also stated that "[a] continued reliance in the future on an unchanging factor . . . runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Id.*[19]

However, the *Biggs* dicta is not applicable in this case, because the Board's denial was not based solely on the commitment offense and Petitioner's pre-commitment offenses. The Board also based its denial on the fact that Petitioner requires more self-help and therapy with respect to insight. Therefore, Petitioner's case does not implicate the concerns expressed in *Biggs*.

///

---

[19]The Ninth Circuit put this notion to rest in *Sass v. Cal. Bd. of Prison Terms,* where it stated, "[w]hile upholding an unsuitability determination based on these same factors, we previously acknowledged [in *Biggs*] that 'continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and *could* result in a due process violation.' *Under the AEDPA it is not our function to speculate about how future parole hearings could proceed.*" 2006 WL 2506393, at *4 (emphasis added).

16

///

      D.     <u>Petitioner Did Not Receive a "Pro Forma" Adjudication From the Parole Board</u>

Petitioner argues that he received a "pro forma" adjudication from the Board and, as such, the hearing did not comply with the requirements of due process. However, the Supreme Court has held that a parole procedure complies with due process requirements of the Constitution if the Board affords an inmate: (1) an opportunity to be heard; and (2) informs the inmate how he falls short of qualifying for parole, if parole is denied. *Greenholz v. Inmates of Neb. Pen. & Corr. Complex*, 442 U.S. 1, 16 (1979).

Therefore, this Court finds that Petitioner did not receive a "pro forma" adjudication from the Board because he had an opportunity to be heard, and the Board informed him as to how he fell short of qualifying for parole.

## CONCLUSION

For the foregoing reasons, Petitioner is not entitled to habeas relief on the grounds that the Board's denial of parole was a violation of his due process rights. Accordingly, the Court **DENIES** this petition for a writ of habeas corpus.

**IT IS SO ORDERED.**

Dated: November 02, 2006

                                               MARTIN J. JENKINS
                                               UNITED STATES DISTRICT JUDGE